UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JENNIFER LATOWSKI,

        Plaintiff,

                                         Case No. 11-11086

v.                                  Honorable Thomas L. Ludington

NORTHWOODS NURSING CENTER,

        Defendant.

_____ /

**OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION
AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

     This dispute arises out of the termination of Plaintiff Jennifer Latowski's employment with Defendant Northwoods Nursing Center. In ending the employment relationship, Plaintiff alleges, Defendant violated several federal and state laws. First, Plaintiff alleges, Defendant violated Title VII of the Civil Rights Act of 1964 by discriminating against Plaintiff because of her pregnancy and gender. Second, Plaintiff alleges, Defendant violated the Americans with Disabilities Act by regarding Plaintiff as disabled yet not making reasonable accommodation for Plaintiff's pregnancy. Third, Plaintiff alleges, Defendant violated the corresponding Michigan state laws prohibiting discrimination on the basis of pregnancy, gender, and disability. Fourth, Plaintiff alleges, Defendant violated the Employee Retirement Income Security Act by terminating Plaintiff's employment to reduce its liability under Defendant's health and disability plans. And fifth, Plaintiff alleges, Defendant violated the Family and Medical Leave Act by interfering with Plaintiff's right to medical leave.

The case was referred to Magistrate Judge Charles E. Binder pursuant to 28 U.S.C. § 636(b) for general case management.  Defendant answered the complaint, denying liability.  The complaint was amended, twice.  *See* ECF No. 17 (second amended complaint).  Defendant then moved for summary judgment.  ECF No. 28.  September 5, 2012, Judge Binder issued a report recommending that the Court grant Defendant's motion.  ECF No. 38.

Any party may serve and file written objections to the report and recommendation issued by a magistrate judge.  28 U.S.C. § 636(b)(1).  The district court will make a "de novo determination of those portions of the report . . . to which objection is made."  28 U.S.C. § 636(b)(1).  The Court is not obligated to review the portions of the report to which no objection was made.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985).

Plaintiff has filed five objections.  ECF No. 61.  For the reasons that follow, Plaintiff's objections will be overruled, the report and recommendation will be adopted, and Defendant's motion for summary judgment will be granted, and Plaintiff's second amended complaint will be dismissed with prejudice.

# I

## A

Plaintiff worked as a certified nurse's aide for Defendant from July 2007 to October 2008.  *See* Pl. Dep. 9, 48, Aug. 24, 2011, *attached as* Def.'s Mot. Summ. J. Ex. A.

Plaintiff's job included assisting patients getting in and out of bed, wheelchairs, and showers.  Pl. Dep 17–40.  If a patient fell, Plaintiff recounts, "We would not catch them. [Rather, we've] been trained to ease them down to the floor to soften the blow. . . .  I am trained to brace their fall if I can without injuring myself."  Pl. Dep. 20–21.  Elaborating, Plaintiff

continues: "I would spread my legs so that my weight was equally distributed so that I would not go down, bend my knees and actually place a knee between their legs and let them slide down my knee and slowly hold onto them until they hit the floor." Pl. Dep. 22. Plaintiff was also required to help patients reposition themselves in bed. She explains: "There's an assistive device underneath them. We call them 'blue pads' or 'chuck pads,' but it's actually — you can use that. It's a heavy-duty sheet, and you get ahold of each — the one side, and you can just lift." Pl. Dep. 23–24.

As a condition of employment, Plaintiff was required to pass a physical examination. Pl. Dep. 13–14. In the physical, Plaintiff recalls, her doctor had her lift a box containing a fifty pound weight, "to show the ability to do the job." Pl. Dep. 13. She elaborates: "He had a box that had handles on it and he had a ball in it that he stated weighed 50 pounds and he had me bend over, properly lift it up without using my back, bending with my knees, lifting it up, walking across the room and setting it down." Pl. Dep. 13.

During her employment with Defendant, Plaintiff recalls, the heaviest patient she had to assist was "400 plus" pounds. Pl. Dep. 20. But on average, Plaintiff estimates, the men she assisted weighed about 200 pounds, the women 150 pounds. Pl. Dep. 20.

**B**

Plaintiff learned that she was pregnant on August 1, 2008. Pl. Dep. 39. She did not inform Defendant. In September, Plaintiff refused a tuberculosis test. Pl. Dep. 42. When she was asked why she was refusing to take the test, Plaintiff disclosed that she was pregnant. Pl. Dep. 42. The ward clerk responsible for setting Plaintiff's shift schedule, Maurine Roberts, recalls that Plaintiff volunteered the information. In her deposition, Ms. Roberts was asked:

Q: Did [Plaintiff] just walk up to you and say, hi, I'm pregnant? Was there a conversation where it came up? Did you ask her?

A: No, there was a conversation. She came to me. She had mentioned that she was pregnant and that was about it. . . .

Q: Okay. What did she say to you?

A: That she was —

Q: Other than, I'm pregnant, anything else you remember?

A: That she was pregnant.

Q: Okay. What was your response?

A: I asked her if she had seen a doctor. She said she had an appointment next week.

Q: Why did you ask her if she had seen a doctor?

A: Well, it was our practice to get a medical — if anything was medical we would ask for like a doctor's slip.

Q: What do you mean if anything was medical?

A: If someone would come to me and say something we would just — it was our practice to ask them for some kind of like doctor's slip. . . .

Q: She says, I'm pregnant, and you said, are you seeing a doctor?

A: Are you seeing a doctor, yes.

Q: Why, what do you care?

A: Because it was our practice to ask for a doctor's slip with anything medical that was brought to our attention.

Q: And that included pregnancy?

A: That included anything medical.

Roberts Dep. 6–7, Dec. 13, 2011, *attached as* Def.'s Mot. Ex. C. Plaintiff confirms that Ms. Roberts told Plaintiff "that I had to bring a note from my doctor in order to work otherwise I would be taken off the schedule, that was their policy. . . . I said, 'I don't understand. Why would I need a note? I haven't missed any work,' which led into a conversation with Judy Doyle[1] that I needed a note stating that I had no restrictions." Pl. Dep. 42–43.

## C

On October 1, 2008, Plaintiff saw her doctor, Diane Traenkle, D.O. *See* Pl.'s Med. R., *attached as* Pl.'s Resp. to Def.'s Mot. Ex. 14. That day, Dr. Traenkle faxed a note to Defendant restricting Plaintiff's physical activities — "No lifting over 50 pounds." *Id.*; *see also* Pl. Dep. 46.

---

[1] Ms. Doyle was Ms. Roberts' supervisor.

-4-

Ms. Roberts received the fax.  Roberts Dep. 13.  She brought it to the attention of her supervisor, Judy Doyle.  Roberts Dep. 13; *see also* Doyle Dep. 11–12, Jan. 13, 2012, *attached as* Pl.'s Resp. to Def.'s Mot. Ex. 3.

Ms. Roberts then called Plaintiff "[t]o ask her about the restriction."  Roberts Dep. 13; *see also* Pl. Dep. 51–52.  Plaintiff did not answer, and so Ms. Roberts left a message and removed Plaintiff from her scheduled shift for that evening.  *See* Roberts Dep. 13, 15.

When Plaintiff called back, she spoke with Ms. Doyle, who notified Plaintiff that her scheduled shift that evening had been cancelled and that she could not resume work until her doctor's restriction was lifted.  *See* Pl. Dep. 51–52.  Ms. Doyle's notes of the conversation record:

> When [Plaintiff] called, I took the phone call as [Ms. Roberts] was not available. I explained to her that we would not be able to keep her on the schedule because she could not lift more than 50 [pounds].  She was very tearful and sounded very upset.  She stated "How am I going to make my house payment?"  I was very sympathetic, but said gently, "Jennifer, you wouldn't want to lose your baby." She then said she had already had several miscarriages.  She continued to cry, but said maybe her doctor would lift the restriction.  I explained that if she had already lost babies, she would be high risk and the doctor would probably not agree to lift them.  However, I told her that if the restrictions were lifted, and she brought a memo stating that she could work with no restrictions, she would be able to work.  I made it very clear that she could not work until I received word of "no restrictions."  She stated OK and said that she would be going to the doctor tomorrow.

Doyle Notes 1, *attached as* Pl.'s Resp. to Def.'s Mot. Ex. 18.  Plaintiff likewise recalls that Ms. Doyle "encouraged me to talk with my physician and have it reversed because I would not work there with any restrictions, and I had to have the physician change the note in order to work there."  Pl. Dep. 56.

**D**

Inquiring into how a fifty-pound lifting restriction would limit Plaintiff's ability to do her job, Defendant's counsel asked Plaintiff:

> Q:  During the course of your discussions with [Defendant], did you request any accommodation in the sense of having your job duties modified in order for you to continue working?
> A:  No.
> Q:  And you would agree that removing the physical component of your job wouldn't be possible in still allowing you to perform your job?
> A:  No.
> Q:  Well, if you were to show up for work and all the physical parts of your job in terms of repositioning patients, helping them on and off the bed, on and off the toilet and things like that, were eliminated from your job, you wouldn't have much left to do, correct?
> A:  I would be considered light duty, which is what they put people on for [workers compensation] injuries, so, yes, I understand what you are saying.

Pl. Dep. 95–96.  Pursuing a similar line of inquiry, Plaintiff's counsel asked Ms. Doyle:

> Q:  [T]he fact that [Plaintiff] had a weight restriction might not necessarily mean that she can't perform her job, right?
> A:  I would disagree with that.  As a [certified nurse's assistant] and what they're required to do she would be — she would be bearing weight of over 50 pounds at some point during her job performance. . . .  [W]hen she is in [the] process of doing her job [whether] it's positioning, toileting, ambulating, transferring, she is absolutely going to at some point be responsible for 50 pounds or more.

Doyle Dep. 70, 73.

**E**

On October 2, 2008, Plaintiff spoke with her doctor about having the restriction lifted. Pl. Dep. 53, 56–58.  But, Plaintiff acknowledges, her doctor did not contact Defendant to modify (much less remove) the restriction.  Pl. Dep. 55, 58.

That day, Plaintiff reported for her shift.  Pl. Dep. 53.  Arriving at work, she had another

conversation with Ms. Doyle.  Pl. Dep. 54–55.  Inquiring into that conversation, Defendant's

counsel asked Plaintiff in her deposition:

> Q:  Tell me about that discussion.
> A:  [Ms. Doyle] was the on-call nurse.  Erin Burns was another nurse and she had me call [Ms. Doyle] at home to figure out if anyone knew anything about receiving anything from my physician.  Because at that time I did not know if North Woods had received — indeed received a fax, because I was still under the impression that [another] fax had been or should have been sent.  [Ms. Doyle] informed me that she had not received anything from my physician and she made it very clear that I was not to return to work there with any restrictions and that I would not work at North Woods.
> Q:  Okay.  So at that point that you had that discussion with [Ms. Doyle] did you understand whether the facility had or had not received [the fax containing the 50 pound lifting restriction]?
> A:  Yes, I understood that they had received a restriction — this (indicating) restriction.  I did not understand whether or not they had received [an] additional fax from my physician stating that I had no restrictions and that I could go to work.
> A:  Okay.  Did you ask?
> Q:  Did I ask?  Yes, I asked [Ms. Doyle], yes.
> Q:  All right.  And she said they had not received anything further?
> A:  She said they had not heard from my physician; correct.
> Q:  Okay.  So at that point of that discussion what the facility had in its hands was [the fax] giving the 50-pound weight restriction?
> A:  Yeah.
> Q:  And to your knowledge the facility never received anything from your physician's office lifting the 50-pound weight restriction?
> A:  Correct. . . .
> Q:  And then you abandoned that process [of going to the doctor's office to have the weight restriction modified] after they walked you out that evening?
> A:  They walked me out with less than 48 hours of receiving this.
> Q:  But the question is, did you then abandon that process of asking for a doctor's note without restrictions?
> A:  Yes, after I was terminated, yes.

Pl. Dep. 54–55, 57.  Plaintiff was escorted from the premises.  Pl. Dep. 53–54.  Moreover, she

asserts, she was informed that she had "self-resigned."  Pl. Dep. 53–54.

**F**

About two weeks later, Plaintiff received a call from Ms. Doyle.  Pl. Dep. 62.  Plaintiff

recalls that on October 15, 2008, Ms. Doyle "left me a message and said that she had something

that might be interesting or of benefit to me and for me to call her back."  Pl. Dep. 62.  When

Plaintiff did, Ms. Doyle informed Plaintiff about FMLA leave.  Plaintiff recalls:

> A:  She said that [she] . . . had reviewed my file and she had been made aware that
>    I had been there for a year and that would mean I was eligible for FMLA.
>    And she said, 'Did you — are you aware that you are eligible for FMLA?
> Q:  And what was your response?
> A:  "Yes."  And she said, "Why didn't you tell me?" and "This is something that
>    could help you."  And "If that's not something that you are interested in" —
>    and she asked me if I understood what FMLA was.  I told her that I fully
>    understood what FMLA was but that I didn't feel that it would help me at that
>    time. . . .  It was a very short conversation.  We just discussed FMLA.
> Q:  You told her you didn't think it would help at that time.  What was the basis
>    of that comment?
> A:  My reasoning?
> Q:  Right.
> A:  My reasoning is, is because it only lasts for 12 weeks and a pregnancy lasts
>    for 10 [sic] months.  So then it would — I would take it, which would secure
>    my job, but then at the end of that I would still be pregnant and I would still
>    have restrictions. . . .
> Q:  So did she tell you during that conversation that if your restrictions were lifted
>    you could resume your employment?
> A:  No, we did not, no.  During the conversation she said that it would buy me
>    time, that in 12 weeks I could get a second opinion from a physician.  I could
>    buy some time and "You never know what happens."  So she could have
>    alluded to not having restrictions and having my job back or — in that way.
>    So she could have alluded to it.  She also said that, "You never know, you
>    might not even be pregnant."  So she did allude to the fact that the problem
>    could have went away or been resolved at some point and that I could have
>    resumed employment.

Pl. Dep. 62–64.  Elaborating about why she declined Defendant's invitation to take FMLA leave,

Plaintiff continued: "In my opinion, when that 12 weeks was up then they would have been able

to — I would not have been able to go back to work possibly, and then what happens down the

-8-

road when I need the FMLA?  I'm no longer eligible to use it.  So it doesn't benefit me, first of all, and also in my opinion, they had already discriminated against me and I didn't want to be employed with them anymore."  Pl. Dep. 64.  And elaborating on why she felt discriminated against, Plaintiff explained:

> I mean that there was other people that had restrictions that were non-work related and they accommodated them or they helped them or they were — you know, they were nice to them.  I'm not saying as far as accommodating as far as allowed them to work with restrictions, but they were nice with them.

Pl. Dep. 73. When Plaintiff was asked if she was aware of any other women who worked for Defendant while pregnant, Plaintiff responded: "I don't know that they were pregnant while I worked there, but they had had children while they worked at North Woods, I'm sure yes."  Pl. Dep. 74.  Asked if she had discussed whether these women had restrictions or been taken off the schedule, Plaintiff acknowledged that she did not know.  Pl. Dep. 74.

## G

Five days after Plaintiff's conversation with Ms. Doyle in which Plaintiff declined to take FMLA leave, Defendant's administrator, Mr. Aaron Woods, sent Plaintiff a letter.  *See* Pl.'s Resp. to Def.'s Mot. Ex. 19.  Dated October 20, 2008, the letter informs Plaintiff that "on 10/15/2008, via phone we discussed in detail, the Family Medical Leave Act.  You were given the opportunity to submit the paperwork, but as of today you have not taken that opportunity.  In the position of Certified Nurse['s] Assistant we will not accommodate a non-work related restriction.  We accept your resignation effective today."  *Id*.

## H

Plaintiff filed an EEOC charge on November 12, 2008.  *See* Pl.'s Resp. to Def.'s Mot. 7. In December 2008, Plaintiff returned to Defendant's facility to obtain information from her

personnel file for use in the litigation.  *See* Pl. Dep. 84–85.  While there, she met with Aaron

Woods and Rick Ackerman.  In her deposition, Plaintiff was asked:

> Q:  During the course of the meeting, did Mr. Ackerman again affirm that you had
>      the right to take leave under the Family Medical Leave Act?
> A:  He did.
> Q:  And what was your response to that?
> A:  He asked me — he informed me that he was aware that I did not choose to
>      take FMLA and that I had previously discussed it with Judy, and he asked me
>      why — what my opinion was, and why I didn't feel it was [beneficial]. . . . .
> Q:  And by then you had concluded — did you tell him you had concluded that
>      you did not want to return to North Woods?
> A:  Yes, when he asked I did tell him that, that, no, I did not feel that I would
>      want to work for them because I felt that they had discriminated against me.

Pl. Dep. 86–87.  Inquiring further, counsel asked:

> Q:  During the meeting on December 1st, you indicated there was discussion
>      regarding liabilities.  Was the discussion in the form of "If we let you work
>      with this restriction and something happens we could be liable for that[?]"  Is
>      that how that . . . .
> A:  Yes, it would be — if something happened, they would be liable and they
>      were explaining to me — in the context of that discussion they were
>      explaining to me why their policy does not allow people to work with any
>      restrictions. . . .
> Q:  And they told you that's the policy they apply to everyone that has
>      restrictions?
> A:  Yeah.
> Q:  And you were aware of that from coworkers that had nonwork-related injuries
>      or restrictions?
> A:  I was aware of that as stated in the handbook that was provided to me, that
>      they did not have to accommodate for nonwork-related injuries.
> Q:  And you were aware of that before this whole issue came up with your
>      pregnancy; correct?
> A:  Yeah.
> Q:  And beyond just the handbook, you were aware from looking around and
>      seeing what happened to other employees that people that had nonwork-
>      related restrictions were taken off the schedule?
> A:  But they weren't terminated.

Pl. Dep. 92–93.  When Plaintiff was asked to identify a similarly situated man who was treated

more favorably than Plaintiff, she identified Chad Moss.  Pl. Dep. 122.  Plaintiff explained that

-10-

after he suffered a non-work related injury, "He had a meeting with management and he was taken off the schedule. A food collection was taken up for him and his family, and he returned to work with restrictions." Pl. Dep. 122. Discussing Mr. Moss's restrictions, Plaintiff's counsel asked Mr. Woods:

> Q: Who is Chad Moss?
> A: He was an employee.
> Q: What did he do?
> A: He was a [certified nurse's assistant].
> Q: Do you recall at some point I believe in early 2008 when he had an off work injury, I think a slip and fall?
> A: Yes.
> Q: Okay. That did not occur at work, right?
> A: Correct.
> Q: And because of that slip and fall he had some restrictions, correct?
> A: Correct.
> Q: And do you recall that he was given light duty.
> A: No.
> Q: Do you recall that he had a lifting restriction of 15 pounds?
> A: I don't know what was imposed on him. . . .
> Q: Okay. Your attorney produced this document, it says Authorization for absence . . . to certify that Chad Moss until 3.4.08 unable to lift more than 10 pounds without increased risk of further injury. So I assume that was presented to Northwoods?
> A: Yes.
> Q: Okay. What if anything did Northwoods do in response to getting that lifting restriction for Chad Moss?
> A: He would have been removed from the schedule.
> Q: Why not terminated?
> A: Did we offer him FMLA?
> Q: Well, I'm looking at Defendant's answers to the second set of interrogatories No. 1 and it appears to be a list of everybody who has on FMLA and I don't see Chad Moss's name on there, do you?
> A: About the eighth line down.
> Q: Yes, [here] it is. So eighth line down. So he was on FMLA [leave] on 2.19. So he used FMLA as far as you know, right?
> A: Yes.

Woods Dep. 44–45, Dec. 13, 2011, *attached as* Def.'s Reply Ex. D.

**I**

In March 2011, Plaintiff filed suit in this Court.  As noted, Plaintiff first alleges that Defendant violated Title VII by discriminating against Plaintiff because of her gender and pregnancy.  Second, Plaintiff alleges Defendant violated the Americans with Disabilities Act by regarding Plaintiff as disabled and not making reasonable accommodations for her pregnancy.  Third, Plaintiff alleges analogous state law discrimination claims under the Elliott-Larsen Civil Rights Act and Michigan Persons with Disability Civil Rights Act.  Fourth, Plaintiff alleges that Defendant violated the Employee Retirement Income Security Act by terminating Plaintiff's employment to reduce its liability under Defendant's health and disability plans.  And fifth, Plaintiff alleges that Defendant violated the Family and Medical Leave Act by interfering with Plaintiff's rights under the act.

Following discovery, Defendant moved for summary judgment on each of Plaintiff's claims.  Judge Binder issued a report recommending that the Court grant the motion.  Plaintiff's objections followed.

**II**

Plaintiff makes five objections to the report and recommendation.  The objections are unpersuasive.

**A**

Plaintiff first objects that "the magistrate erred factually, by concluding that Defendant's requirement of a doctor's note was undisputed and/or applied to other medical circumstances besides pregnancy."  Pl.'s Objections 7 (capitalization omitted).  She explains: "This factual error by [Judge Binder] permeated his conclusion that Plaintiff could not establish a prima facie

case of 'indirect' pregnancy discrimination. . . .  North Woods treated Ms. Latowski differently

from a male [certified nurse's assistant] named Chad [Moss]."  *Id*. at 8–9 (quotation marks

omitted) (quoting Pl.'s Resp. to Def.'s Mot. Summ. J. 13).

Drawing all reasonable factual inferences in Plaintiff's favor, she is not correct that a

genuine issue of fact exists regarding a prima facie case of indirect pregnancy discrimination.

Title VII, as amended by the Pregnancy Discrimination Act ("PDA"), provides that

"women affected by pregnancy . . . shall be treated the same for all employment-related purposes

. . . as other persons not so affected but similar in their ability or inability to work."  42 U.S.C. §

2000e(k).  The PDA thus requires an employer to be "pregnancy-blind."  *Reeves v. Swift Transp.*

*Co.*, 446 F.3d 637, 641 (6th Cir. 2006); *accord Serednyj v. Beverly Healthcare, LLC*, 656 F.3d

540, 548 (7th Cir. 2011); *Spivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1312–13 (11th Cir.

1999)).

As with other types of discrimination claims, pregnancy discrimination can be established

by direct or indirect evidence.  In *Reeves v. Swift Transportation Co.*, 446 F.3d 637 (6th Cir.

2006), for example, the Sixth Circuit held that a policy denying light-duty work to employees

who could not perform heavy lifting and also were not injured on the job was valid under the

PDA, explaining:

> Swift's light-duty policy is indisputably pregnancy-blind.  It simply does not grant
> or deny light work on the basis of pregnancy, childbirth, or related medical
> conditions.  It makes this determination on the nonpregnancy-related basis of
> whether there has been a work-related injury or condition.  Pregnancy-blind
> policies of course can be tools of discrimination.  But challenging them as tools of
> discrimination requires evidence and inference beyond such policies' express
> terms.
>
> Swift's pregnancy-blind policy, therefore, cannot serve as direct evidence of
> Swift's alleged discrimination against Reeves.

-13-

*Id.* at 641.   In this case, as in *Swift*, Defendant's policy is pregnancy-blind.  The policy simply requires that when an employee brings a non-work related medical condition to Defendant's attention, the employee is required to obtain a doctor's opinion on whether the employee was free to work without restrictions.   Plaintiff acknowledged as much in her deposition, where she was asked:

> Q:  [Defendant] told you that's the policy they apply to everyone that has restrictions?
> A:  Yeah.
> Q:  And you were aware of that from coworkers that had nonwork-related injuries or restrictions?
> A:  I was aware of that as stated in the handbook that was provided to me, that they did not have to accommodate for nonwork-related injuries.
> Q:  And you were aware of that before this whole issue came up with your pregnancy; correct?
> A:  Yeah.

Pl. Dep. 92–93.  Regardless of what the non-work related medical condition is, if the employee's work is restricted, Defendant does not accommodate the restriction.   Defendant's policy is not direct evidence of discrimination.

When a plaintiff lacks direct evidence of pregnancy discrimination, as in this case, the plaintiff may establish the claim via indirect evidence.  *Serednyj*, 656 F.3d at 550–51.  "To state a prima facie case for pregnancy discrimination," the Sixth Circuit instructs, "a plaintiff "must show (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision."  *Mullins v. U.S. Bank*, 296 F. App'x 521, 525 (6th Cir. 2008) (citing *Asmo v. Keane, Inc.,* 471 F.3d 588, 592 (6th Cir. 2006)).   A causal nexus can be inferred by demonstrating that similarly situated, non-pregnant employees were treated more favorably.

*Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996) (citing *Int'l Union v. Johnson Controls,* 499 U.S. 187, 204–05 (1991)).  The Sixth Circuit elaborates:

> [W]hen a Title VII litigant alleges discrimination on the basis of pregnancy in violation of the PDA, in order to establish a prima facie case of discrimination, she must demonstrate only that another employee who is similarly situated in her or his ability or inability to work received more favorable benefits.  In addition, of course, she still must meet her burden of demonstrating that she is a member of the class to be protected by the PDA, that she was denied benefits, and that she was qualified to receive those benefits.

*Ensley-Gaines*, 100 F.3d 1220, 1226 (6th Cir. 1996).

In this case, as noted, Plaintiff objects that "North Woods treated Ms. Latowski differently from a male [certified nurse's assistant] named Chad [Moss]."  Plaintiff's objection lacks merit.

As detailed above, both Mr. Moss and Plaintiff had a medical condition that was not caused by their employment with Defendant.  Both were sent to see a doctor.  Both had restrictions placed on their ability to work.  Both had their shifts cancelled when Defendant learned of the restrictions.  Both were offered FMLA leave by Defendant.  Mr. Moss chose to use the FMLA leave rather than have his employment terminated.  Plaintiff did not.   Thus, Defendant did not treat Mr. Moss more favorably than Plaintiff — Mr. Moss and Plaintiff received the same treatment.

Plaintiff's objection will be overruled.

## B

Plaintiff next objects that "the magistrate erred legally, by concluding that there was no direct evidence of discrimination."   Pl.'s Objections 9 (capitalization omitted).   Plaintiff elaborates that "the Magistrate erred by not considering Ackerman's statements, stating 'There is

no evidence that Mr. Ackerman had any part of the decision making process.'  The evidence does not support that conclusion.  The decision was based on a facility 'policy' that Ackerman significantly shaped. . . .  Additionally, Ackerman attended a December 1, 2008 meeting."  *Id.* at 9–10 (citations omitted).  Plaintiff also points to the comments from Ms. Doyle in her phone conversation with Plaintiff on October 1, 2008.  *Id.*

Drawing all reasonable factual inferences in Plaintiff's favor, she is not correct that she has direct evidence of pregnancy discrimination.

"Direct evidence of discrimination is evidence that proves that discrimination has occurred without requiring further inferences."  *Reeves v. Swift Transp. Co., Inc.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)).

In this case, as noted, Defendant's policy is not direct evidence of discrimination.  It is pregnancy blind.  Likewise, one of Defendant's managers (Mr. Ackerman) attendance at a meeting several weeks after Plaintiff's employment was terminated is not direct evidence of discriminatory animus towards Plaintiff's pregnancy.  No evidence suggests that Mr. Ackerman was personally involved in the decision to terminate Plaintiff's employment.  Even if he had been, moreover, none of his comments in the December 1 meeting are direct evidence of discrimination. His explanation that the purpose of Defendant's policy is to limit its liability does not suggest that he harbored discriminatory animus towards Plaintiff's pregnancy.

Similarly, Ms. Doyle's conversation with Plaintiff on October 1 is not direct evidence of discrimination.  As noted, Ms. Doyle's notes of the conversation record:

> I explained to her that we would not be able to keep her on the schedule because she could not lift more than 50 [pounds].  She was very tearful and sounded very upset.  She stated "How am I going to make my house payment?"  I was very

> sympathetic, but said gently, "Jennifer, you wouldn't want to lose your baby."
> She then said she had already had several miscarriages. She continued to cry, but
> said maybe her doctor would lift the restriction. I explained that if she had
> already lost babies, she would be high risk and the doctor would probably not
> agree to lift them. However, I told her that if the restrictions were lifted, and she
> brought a memo stating that she could work with no restrictions, she would be
> able to work. I made it very clear that she could not work until I received word of
> "no restrictions." She stated OK and said that she would be going to the doctor
> tomorrow.

Doyle Notes 1. Drawing all reasonable inferences in Plaintiff's favor, no reasonable juror would

conclude that Ms. Doyle's comments are evidence of discriminatory animus towards Plaintiff's

pregnancy, much less direct evidence. Rather, the conversation shows that Ms. Doyle simply

explained to Plaintiff why her doctor may have imposed the restriction and, moreover, how

Plaintiff could go about getting the restriction lifted.

     Plaintiff's objection will be overruled.

### C

     Plaintiff's third objection is that "the magistrate erred legally, by concluding that there

was insufficient indirect evidence of discrimination concerning Plaintiff's qualifications." Pl.'s

Objections 12 (capitalization omitted). Plaintiff elaborates:

> First, he incorrectly relied on the assumptions that Plaintiff does not challenge
> either Defendant's policy of requiring a doctor's note, or the alleged "pregnancy
> blind" nature of the policy. He also failed to consider the serious dispute as to
> whether lifting more than 50 lbs. was a necessary qualification for the job.

> Second, the Magistrate erred in his legal analysis, with the chief error his failure
> to discuss or apply the most pertinent case regarding pregnancy discrimination in
> this circuit, *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996).

*Id.* (internal citation omitted). Plaintiff's arguments lack merit.

     First, as noted, Defendant's policy is "pregnancy blind." The policy applies to all

certified nurse's assistants, regardless of whether the employees are pregnant. The policy simply

requires that all employees with non-work related medical conditions be cleared by a doctor to work without restrictions. Thus, the issue for Defendant was not whether Plaintiff was able to lift 50 pounds — the issue is whether Plaintiff's work was restricted because of a non-work related medical condition. Because Plaintiff's work was restricted for this reason, Judge Binder correctly concluded that Defendant did not consider Plaintiff qualified for her position.

Moreover, even if Plaintiff was qualified for the position, Defendant would nevertheless be entitled to summary judgment on the pregnancy discrimination claim because Plaintiff has not demonstrated that similarly situated, non-pregnant employees were treated more favorably.

In *Ensley-Gaines*, the Sixth Circuit held that "when a Title VII litigant alleges discrimination on the basis of pregnancy in violation of the PDA, in order to establish a prima facie case of discrimination, she must demonstrate only that another employee who is similarly situated in her or his ability or inability to work received more favorable benefits." 100 F.3d 1226. Reversing the district court's grant of summary judgment in favor of the employer, the Sixth Circuit noted that the plaintiff had identified "a number of nonpregnant, temporarily disabled mailhandlers who were treated more favorably than she was when requesting alternative duties." *Id*. at 1223. Additionally, the court observed that the plaintiff had "suggested a variety of tasks, both inside and outside of the mailhandler craft, that Plaintiff was qualified to perform and would be able to perform with the restrictions imposed upon her by her pregnancy. [She also] recommended small accommodations to her work schedule and assignments that would have enabled Plaintiff to work eight hours per day without a disadvantage to other regular employees, but management ignored these suggestions." *Id*.

In this case, in contrast, the sole non-pregnant employee that Plaintiff identifies as being treated more favorably, Mr. Moss, did not receive better treatment than Plaintiff. He received the same treatment. And unlike the plaintiff in *Ensley-Gaines*, Plaintiff did not seek any accommodation for her lifting restriction. In Plaintiff's deposition, she was asked:

> Q: During the course of your discussions with [Defendant], did you request any accommodation in the sense of having your job duties modified in order for you to continue working?
> A: No.

Pl. Dep. 95–96. Plaintiff's objection will be overruled.

## D

Plaintiff's fourth objection is that "the magistrate erred legally, by concluding that there was insufficient evidence of disability discrimination under the 'regarded as' prong [of the ADA]." Pl.'s Objections 15. She elaborates: "Ms. Doyle directed Ms. Latowski to obtain a doctor's note — essentially establishing a 'rebuttable presumption' that she was disabled. Doyle also expressed (erroneous) concern about Plaintiff's history of multiple miscarriages, and that she was a high-risk pregnancy." *Id.* at 16. To support her objection, Plaintiff relies on *Spees v. James Marine, Inc.*, 617 F.3d 380 (6th Cir. 2010).

Drawing all reasonable factual inferences in Plaintiff's favor, she is not correct that a genuine issue of fact exists regarding a prima facie case of disability discrimination.

The Americans with Disabilities Act prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

A "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  § 12102(1).

"An individual meets the requirement of 'being regarded as having such an impairment,'" the ADA further provides, "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  § 12102(3)(a).

"The regarded-as-disabled prong of the ADA," the Sixth Circuit explains, "protects employees who are perfectly able to perform a job, but are rejected because of the myths, fears and stereotypes associated with disabilities."  *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (ellipsis omitted) (quoting *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008)).  The court elaborates that an employee "may be regarded as disabled when (1) an employer mistakenly believes that an employee has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual, nonlimiting impairment substantially limits one or more of an employee's major life activities. In either case, it is necessary to show that the employer entertains misperceptions about the employee."  *Daugherty*, 544 F.3d at 703–04 (citation, quotation marks, and brackets omitted) (quoting *Gruener*, 510 F.3d at 664).

The Sixth Circuit observes that "pregnancy, by itself, does not constitute a disability under the ADA and thus cannot form the basis of a regarded-as claim.  *Spees*, 617 F.3d at 396 (citing *Richards v. City of Topeka*, 173 F.3d 1247, 1250 n.2 (10th Cir. 1999)).  Nevertheless, the

-20-

court cautions that "a potentially higher risk of having a future miscarriage . . . could constitute an impairment. . . .  [A]n an increased risk of having a miscarriage at a minimum constitutes an impairment falling outside the range of a normal pregnancy."  *Spees*, 617 F.3d at 396.

Here, as noted, Plaintiff objects to Ms. Doyle's instructing Plaintiff to obtain a doctor's opinion regarding her medical condition and Ms. Doyle's "(erroneous) concern about Plaintiff's history of multiple miscarriages, and that she was a high-risk pregnancy."  Pl.'s Objections 16. Plaintiff's objections are not well made.

Obtaining a doctor's opinion, as noted, was required of all employees who brought a medical condition to Defendant's attention.  This general policy was applied to Plaintiff because she was one of Defendant's employees, not because she was regarded as disabled.

Likewise, Ms. Doyle's mention of miscarriages was not an expression of Ms. Doyle's perception of Plaintiff's abilities, but in discussion of why Plaintiff's own doctor imposed the limitation.  As noted, Ms. Doyle's notes of the conversation record:

> She was very tearful and sounded very upset.  She stated "How am I going to make my house payment?"  I was very sympathetic, but said gently, "Jennifer, you wouldn't want to lose your baby."  She then said she had already had several miscarriages.  She continued to cry, but said maybe her doctor would lift the restriction.  I explained that if she had already lost babies, she would be high risk and the doctor would probably not agree to lift them.  However, I told her that if the restrictions were lifted, and she brought a memo stating that she could work with no restrictions, she would be able to work.  I made it very clear that she could not work until I received word of "no restrictions."  She stated OK and said that she would be going to the doctor tomorrow.

Doyle Notes 1.  Ms. Doyle did not express an opinion on whether Plaintiff's pregnancy would impair her ability to work— Ms. Doyle left that decision to Plaintiff's doctor.

Plaintiff's doctor, however, never lifted the restrictions.  Thus, this case is distinguishable from *Spees*, where the plaintiff initially received a "Certificate to Return to Work" from her

doctor "that did not list any restrictions on her ability to [work]."  617 F.3d at 385.  When the plaintiff's supervisor learned of the doctor's recommendation, the supervisor instructed the plaintiff to go back to her doctor and get a second note "limiting her to 'light duty.'"  *Id*.  His concerns were "in part driven by the fact that [the plaintiff] had complications with other pregnancies before."  *Id*. (quotation marks omitted).  The plaintiff complied.  *Id*.  The doctor, in turn, complied with the plaintiff's request and restricted her to light duty though "[h]e testified that . . . there was no medical reason to limit [the plaintiff's] job duties."  *Id*. at 386.  From this, the Sixth Circuit inferred that the defendant may have regarded the plaintiff as having a disability.  *Id*. at 397.

Here, in contrast, there is no evidence that Defendant ignored the medical advice of Plaintiff's doctor.  On the contrary, Ms. Doyle said that Plaintiff would be able to work if cleared by her doctor.  Plaintiff's reliance on *Spees* is misplaced.

Plaintiff's objection will be overruled.

**E**

Finally, Plaintiff objects that "the magistrate erred legally, by concluding that there was insufficient evidence of FMLA interference."  Pl.'s Objections 17.  Plaintiff elaborates that "being required to take FMLA leave involuntarily, as Ms. Latowski was when she was forced between taking FMLA leave in the middle of her pregnancy or losing her job, is an actionable claim of FMLA interference."  *Id*. (citing *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007)).  Plaintiff's objection lacks merit.

The Family Medical Leave Act provides: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

In *Wysong*, the Sixth Circuit explained that "an employee may have a claim under § 2615(a)(1) when an employer forces an employee to take FMLA leave when the employee does not have a 'serious health condition' that precludes her from working." 503 F.3d at 449 (citing *Hicks v. Leroy's Jewelers, Inc.*, No. 98-6596, 2000 WL 1033029, at *3-4 (6th Cir. July 17, 2000) (unpublished); Megan E. Blomquist, *A Shield, Not a Sword: Involuntary Leave Under the Family and Medical Leave Act,* 76 Wash. L. Rev. 509, 529–31 (2001)). But, crucially, the court cautioned that "the employee's claim ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past." *Wysong*, 503 F.3d at 449.

In this case, Plaintiff's claim has not ripened. She did not seek FMLA leave at a later date. She ended the employment relationship instead.

Plaintiff's objection will be overruled.

### III

Accordingly, it is **ORDERED** that Judge Binder's report and recommendation (ECF No. 38) is **ADOPTED**.

It is further **ORDERED** that Plaintiff's objections (ECF No. 39) are **OVERRULED**.

It is further **ORDERED** that Defendant's motion for summary judgment (ECF No. 28) is **GRANTED**.

It is further **ORDERED** that Plaintiff's second amended complaint (ECF No. 17) is

**DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 27, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 27, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS